# Illinois Official Reports

## Appellate Court

---

### *People v. Trotter*, 2013 IL App (2d) 120363

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONALD R. TROTTER, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-12-0363 |
| Filed | December 13, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On defendant's appeal from the imposition of consecutive terms for criminal sexual assault and concurrent terms for child abduction and unlawfully transferring a travel ticket to a minor, the appellate court rejected defendant's contention that he was not proved guilty of child abduction, but the court remanded the cause for resentencing, since the child abduction sentence should have been consecutive to the criminal sexual assault sentences, and the fixed, three-year period of mandatory supervised release on the criminal sexual assault convictions should have been an indeterminate term of three years to natural life on each conviction, and on remand, the trial court would have to determine the appropriate sentences to be imposed consecutively and correct the MSR term. |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 09-CF-2439; the Hon. Joseph G. McGraw, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; cause remanded. |

| Counsel on Appeal | Thomas A. Lilien and Paul Alexander Rogers, both of State Appellate Defender's Office, of Elgin, for appellant. |
| | Joseph P. Bruscato, State's Attorney, of Rockford (Lawrence M. Bauer and Barry W. Jacobs, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion. |
| | Justices Hutchinson and Jorgensen concurred in the judgment and opinion. |

## OPINION

¶ 1    Following a jury trial, defendant, Donald R. Trotter, was found guilty of three counts of criminal sexual assault (720 ILCS 5/12-13(a)(4) (West 2008)), four counts of aggravated criminal sexual abuse (720 ILCS 5/12-16(d) (West 2008)), one count of child abduction (720 ILCS 5/10-5(b)(10) (West 2008)), and one count of unlawfully sending a travel ticket to a minor (720 ILCS 5/10-8.1(b)(1) (West 2008)). The court imposed consecutive 15-year terms of imprisonment on each of the criminal sexual assault offenses, a concurrent 3-year term of imprisonment on the child abduction offense, and a concurrent 1-year term of imprisonment on the offense of unlawfully sending a travel ticket to a minor. (The convictions for aggravated criminal sexual abuse were merged into the criminal sexual assault convictions for sentencing purposes.) Defendant contends on appeal that the State failed to prove that he was guilty of child abduction beyond a reasonable doubt. He also contends that his sentences are excessive. We affirm the convictions but vacate the sentences for criminal sexual assault and child abduction. We remand the cause for the trial court to impose appropriate consecutive sentences for those offenses and to impose an indeterminate term of mandatory supervised release (MSR) of three years to natural life on each of the criminal sexual assault convictions.

¶ 2                                I. FACTS
¶ 3    On August 2, 2009, the Rockford police department was informed that a 13-year-old runaway named C.G. had left Rockford without her parents' knowledge or consent and had flown alone from O'Hare Airport in Chicago, Illinois, to Orange County, California. Upon investigation, law enforcement found C.G. with defendant in an apartment in Long Beach, California. Defendant was 54 years old at the time.

¶ 4    C.G. spoke with police and gave a written statement admitting that she and defendant met sometime in November 2008 and began a sexual relationship around May 2009. Defendant

had provided her with the plane ticket to California, had driven her to O'Hare Airport, had given her a key to the apartment in Long Beach, which he had rented, and had arranged for her transportation by car service from the Orange County airport to the apartment.

¶ 5 Defendant was arrested and returned to Rockford, where he was charged by indictment with criminal sexual assault, aggravated criminal sexual abuse, child abduction, and sending a public conveyance travel ticket to a minor for an unlawful purpose. All of the sex offenses were based on defendant's alleged conduct with C.G. between June 1 and August 1, 2009. The three criminal sexual assault counts alleged that defendant had sex with C.G. while he held a "position of trust, authority, or supervision" in relation to her. The offense of unlawfully sending a travel ticket to C.G. was alleged to have occurred in July 2009. The child abduction count alleged that defendant had committed that offense on August 1, 2009, when he "lured" C.G. into his motor vehicle for other than a lawful purpose.

¶ 6 A superseding indictment was filed on February 9, 2011, in which the criminal sexual assault counts specified that defendant held a "position of trust, authority, or supervision" with respect to C.G. in that he was acting as her "caretaker or chaperone" when the sexual conduct allegedly occurred.

¶ 7 A jury trial began on August 22, 2011. More than two dozen witnesses testified at trial, all of them for the State, including C.G. The following evidence was introduced at the trial.

¶ 8 C.G. had initially met defendant at a restaurant in November 2008, where defendant was handing out flyers to promote an upcoming community youth theater production of *Beauty and the Beast*. C.G. told defendant that she was planning to audition for a part, and she eventually was cast in a few minor roles.

¶ 9 Rehearsals were held from late November 2008 to February 2009, when the play was performed. Defendant was responsible for running the sound equipment for the play, and C.G. would see him at rehearsals. Sometime during the rehearsal period, C.G. called or texted defendant to ask him something about the play. At that time, C.G. thought of defendant as "just an adult that was working on the show." That changed, and they began exchanging text messages on a more regular basis. C.G. described the nature of the messages as "just everyday conversation, like 'hi, how are you?' "

¶ 10 Defendant was married and had a daughter named S.T., who was around the same age as C.G. and was among C.G.'s friends. S.T. also was involved in the play. Sometime between March and May 2009, S.T. invited C.G. to spend the night at her home, where she lived with her mother and defendant.

¶ 11 Prior to the sleepover, defendant and S.T. picked up C.G. at her home, and defendant spoke to C.G.'s parents on that occasion. C.G.'s mother had previously met defendant through C.G. because of C.G.'s involvement in the theater group. C.G.'s mother thought that C.G. would be supervised properly during the sleepover since adults would be present.

¶ 12 Also during the spring of 2009, C.G. became involved in *Bugsy Malone*, another play produced by the theater group. C.G. assisted defendant in running the sound equipment. While that play was in rehearsal, C.G. and defendant continued to exchange text messages on a frequent basis, sometimes more than once per day. By this time, the texts were not what C.G.

described as "everyday things" but involved "past relationships." Defendant sometimes would give C.G. rides to or from the rehearsals. Defendant also would pick up C.G. at her school and take her to rehearsals.

¶ 13    As rehearsals for *Bugsy Malone* continued, the nature and tone of the texts between C.G. and defendant evolved further. According to C.G., she and defendant formed "more of a relationship." One day defendant sent C.G. a text saying: "I think I am in love with you," to which C.G. responded: "[B]ut it's nothing sexual, right?" Defendant replied, "Yes." C.G. and defendant tried to define their relationship and settled on "BFDF," which stood for "best friend, daughter father." Defendant had suggested that definition. C.G. described the relationship as being more of "a boyfriend/girlfriend type."

¶ 14    C.G. believed that defendant was someone she could trust. She and defendant would confide in each other. She talked to him about the problems she experienced with her family and he told her that he had gone through similar experiences when he was her age. Defendant confided that his real name was "Daniel Black," that he worked for the National Security Administration, not for Siemens Company, and that he was only 44 years old, even though he had previously told her that he was 54 years old.

¶ 15    On the evening of May 2, 2009, defendant attended a benefit that C.G.'s family organized to raise money for a friend who had leukemia. C.G.'s mother had asked defendant to help organize the benefit, because she knew that defendant was very involved in the community. On the day of the benefit, C.G. attended a rehearsal for *Bugsy Malone*. Defendant gave C.G. a ride from the rehearsal to the benefit. Later, C.G. had to leave the benefit to attend a rehearsal for another play at a local school and defendant gave C.G. a ride to that rehearsal. On the way, defendant stopped in the parking lot of a retail store and repeatedly asked C.G. if he could kiss her. After initially refusing, C.G. allowed defendant to kiss her.

¶ 16    On May 31, 2009, C.G.'s family held a high school graduation party for C.G.'s sister. With her mother's permission, C.G. invited defendant to the party. Defendant brought two gifts, a $100 gift certificate for C.G.'s sister and a $200 gift certificate for C.G. Defendant previously had given C.G. other items, including an iPod and a cell phone. C.G.'s mother knew about those items, and defendant agreed to accept some payment for them.

¶ 17    During the graduation party, C.G. spent much of her time with defendant and they went on a walk together. After the party, several people, including defendant, went to C.G.'s house. C.G.'s family became concerned about the nature and extent of her relationship with defendant and later her parents told her that she would not be allowed to spend any more time with defendant. C.G. agreed although she still wanted to see defendant.

¶ 18    Defendant's wife, Darcy, also determined that C.G. had been forming what she called an "unusual attachment" to defendant. While defendant and C.G. were still working together in the theater productions, Darcy told defendant that he should "back off" of C.G. because she either had come to regard him as a "father-figure or had developed a crush" on him.

¶ 19    Darcy believed that the situation had resolved itself when the production of *Bugsy Malone* ended in May 2009. Darcy assumed that defendant and C.G. were no longer "in contact" with each other. At the same time, however, defendant began to isolate himself in his office at

home. He eventually stopped sleeping in the same bedroom with Darcy and began sleeping on a couch in the office. Defendant also started spending more time away from the house on weekends. He told Darcy that he was playing golf with some of his coworkers, which he previously had not done.

¶ 20    Even though C.G. told her parents that she would stop seeing defendant, C.G. continued her relationship with him during the summer of 2009. C.G. felt that she was falling in love with defendant. During June, C.G. began to see defendant a few times per week. He would pick her up at her house while her parents were away. They also exchanged as many as 4,000 texts per month from May through July. Toward the end of June, defendant told C.G. that he wanted to have sex with her. At first, she said she was not sure she was ready for that, but later she "decided to go along with it."

¶ 21    According to C.G., she and defendant had sex on five occasions at various locations in Winnebago County during June and July. They also had sex once in Chicago when they took a trip there. C.G.'s sexual activity with defendant included penis-to-vagina intercourse, fellatio, and cunnilingus. On at least one of these occasions, defendant bought some champagne, some of which C.G. drank.

¶ 22    C.G. testified that defendant was "pretty much everything" to her at that time. They would call each other "boyfriend and girlfriend," and C.G. wanted to marry defendant. Because they could not be legally married until C.G. was older, defendant decided that they should consider themselves to be "spiritually married." At times, they would call each other "husband and wife."

¶ 23    During this time, defendant gave C.G. two smart phones, both of which were billed to him. One time, defendant took C.G. to Target to buy her a bra and some underwear, although C.G. selected the particular items she wanted.

¶ 24    As the summer progressed, C.G. decided that she wanted to run away from home and be with defendant. He expressed concern that C.G. would be harmed if she ran away and he asked if she had any doubts about running away. They eventually decided that C.G. would go to California, where defendant often traveled for business. In late July, defendant told C.G. that he had rented an apartment in Long Beach.

¶ 25    C.G. and defendant developed a plan for her to fly to Long Beach by herself on August 1, and for defendant to fly there about a week later. There was no plan for defendant to stay with C.G. on a permanent basis. Instead, the plan was for C.G. to live by herself in Long Beach and for defendant to visit her for a week or so whenever he traveled there on business.

¶ 26    On Saturday, August 1, 2009, C.G. had her sister drive her to a local mall purportedly to buy a birthday present for a friend who was having a sleepover birthday party. Defendant had prepared an invitation with the friend's name, which C.G. had shown her parents.

¶ 27    After her sister dropped her off at the mall, defendant met her at a predetermined spot. She got into his car. She previously had given defendant a bag that she had packed for the trip. Defendant drove C.G. to O'Hare Airport, where she boarded a flight to Orange County, using a ticket defendant had purchased in mid-July. The ticket bore the name of defendant's daughter, S.T. Defendant gave C.G. a copy of S.T.'s birth certificate and told C.G. that if she was

questioned about her identity, she should say that she was S.T. Defendant told C.G. to use the name "Haley Black" once she landed in California. C.G.'s parents had not given defendant permission to send C.G. to California.

¶ 28    Defendant had arranged for a car service to pick up C.G. at the Orange County airport. The service drove her to the apartment in Long Beach, and she entered the apartment using the key defendant had given her.

¶ 29    C.G. spoke to defendant by phone either that same night or the next night. She asked if he could come out to Long Beach sooner than he had planned, because she had never spent the night alone anywhere before and she was scared. Defendant told her that he would fly to Long Beach on Monday, August 3. C.G. did not call her parents, because defendant had told her that she could not contact her family until she turned 18 years old. Before she left Rockford, defendant had told C.G. that he would get in "a lot of trouble" if he got caught with C.G. and that, if they were caught, she should say that "nothing sexual had happened," "stick with the best friend daughter father, BFDF" description, and say that defendant was "helping" her.

¶ 30    Between August 1 and 5, defendant spoke by telephone to a Rockford police detective and to C.G.'s mother. He told the detective that he had a "father/daughter type relationship" with C.G. but had not seen her in two weeks. He told C.G.'s mother that he had not had any contact with C.G. for three months.

¶ 31    Defendant arrived at the Long Beach apartment about 5 p.m. on August 3. C.G. and defendant had sex in the apartment that night and on the night of August 4.

¶ 32    Some FBI agents and other law enforcement personnel arrived at the apartment at approximately 11:30 p.m. on August 5. The agents knocked on the apartment door, which defendant eventually opened. After acknowledging that C.G. also was in the apartment, defendant was arrested and taken into the hallway. The agents located C.G. in bed in the apartment. C.G. seemed groggy and confused. She and defendant had consumed "a lot" of champagne and rum that night. Initially, C.G. was uncooperative, but the agents eventually succeeded in removing her from the apartment.

¶ 33    After the agents took C.G., they questioned defendant. Defendant admitted that he had thought about having sex with C.G. but said that he had not actually done so. Defendant agreed to give a written statement, which he prepared and signed, but he denied having sex with C.G.

¶ 34    The agents took C.G. to a hospital for an examination. C.G. refused to submit to an examination and told a nurse that she had not had sex with defendant. About a week after she was flown home, she saw a pediatrician who gave her a vaginal examination and obtained a "vaginal wash."

¶ 35    Defendant remained in custody, where he was interviewed by two FBI agents. An audio recording of that interview was admitted into evidence. While in custody, defendant gave written consent for the FBI to search the Long Beach apartment, as well as two laptop computers, one of which was a Dell.

¶ 36    The FBI agents recovered other items from the apartment, including bedding and a foil wrapper of pills. One pill was missing from the wrapper. Forensic tests showed that the pills contained the active ingredient for Viagra.

¶ 37    Testing also showed that the fitted sheet taken from the bed in the Long Beach apartment had a semen stain. The semen stain included DNA from two individuals. A sample of defendant's DNA matched one of the DNA profiles found in the stain. C.G.'s DNA could not be excluded as the source of the second DNA profile found in the stain.

¶ 38    Tests done on the vaginal wash obtained from C.G. showed that it contained a Y chromosome, which could come only from a male. The profile of the DNA on that Y chromosome matched defendant's DNA profile.

¶ 39    A forensic examination performed on the hard drive in the Dell laptop found in the Long Beach apartment showed that it contained numerous text messages to and from someone named "Daniel Black." The expert who examined the computer generated a document containing the content of those text messages. During her testimony, C.G. identified several excerpts from that document, identified them as messages she had exchanged with defendant during the summer of 2009, and read excerpts to the jury.

¶ 40    In September 2010, C.G. received a letter from defendant while he was incarcerated awaiting trial. The letter consisted mostly of numbers, with only a few words. C.G. showed the letter to her mother, who immediately notified the Rockford police. The letter began with the phrases, "n-a-s-b-v 1999" and "in the beginning." The officer who examined the letter testified that it was written in code and appeared to refer to the "New American Standard Bible." After searching defendant's cell, which was occupied solely by defendant, a detective discovered a copy of the New American Standard Bible and a dictionary. The detective took the books back to the police station, where she gave them to the officer who had received the letter from C.G.'s mother. The officer and the detective used the Bible to decode the letter and prepared the following written interpretation:

> "In the beginning [C.G.] what gain has been made, so much pain, darkness, and sadness. You must not be a witness. Need to restore life. Please say you lied. Be strong. I love you. Remember the ocean. Ah-ha, Ireland is soon. Help me, BFDF love link, hurry. The grass withers, the flower fades. Jesus."

¶ 41    C.G. testified that defendant had bought her a sweatshirt bearing the word "Ireland" when they had visited Chicago and that "love link" was a nickname defendant had given her.

¶ 42    Following closing arguments and instructions, the jury found defendant guilty of all nine counts. Defendant filed a motion for a new trial and, after sentencing, a motion to reconsider the sentences. Both motions were denied.

¶ 43                                    II. ANALYSIS
¶ 44                            A. Sufficiency of the Evidence
¶ 45    Defendant contends that the evidence did not prove him guilty of child abduction beyond a reasonable doubt. When considering a challenge to a criminal conviction based upon the sufficiency of the evidence, it is not our function to retry the defendant. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Rather, our inquiry is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); accord *People v. Cox*, 195 Ill. 2d 378, 387 (2001).

¶ 46 A person commits child abduction when he intentionally lures or attempts to lure a child under the age of 16 into a motor vehicle without the consent of the child's parent or lawful custodian for other than a lawful purpose. 720 ILCS 5/10-5(b)(10) (West 2008).

¶ 47 Defendant argues that the evidence was insufficient to show that he lured C.G. into his car. Defendant maintains that C.G. entered his car "voluntarily" and that, while he encouraged C.G. and certainly wanted her to enter his car, his actions did not constitute luring within the meaning of section 10-5(b)(10). We disagree.

¶ 48 At the time of the offense, the term "lure" was not defined in section 10-5(b)(10).[1] The term "lure" is commonly defined as " 'an inducement to pleasure or gain' " and " 'enticement.' " *People v. George*, 326 Ill. App. 3d 1096, 1102 (2002) (quoting Merriam Webster's Collegiate Dictionary 694 (10th ed. 1998)). In determining whether defendant lured C.G. into his car, we must examine the totality of the circumstances. See *id.*

¶ 49 We find *George* analogous to the instant case. In *George*, the defendant learned from B.W., a 12-year-old boy, that he wanted to run away from home. The defendant told B.W. that he was a police officer, that he had radioed other officers at the police station, and that officers were on their way. The defendant told B.W. that, if he accepted "some sort of punishment," the defendant could make it so that the other officers would not come for him. The defendant then sexually assaulted B.W. repeatedly over the course of the next several days. *Id.* at 1099. The defendant told B.W. that he had to devise a plan so that B.W. would not get arrested. *Id.* at 1100. The defendant told B.W. that he had adopted him and that they would live in his home, where he kept dogs. The defendant and B.W. boarded a bus, and the police entered the bus and arrested the defendant. *Id.*

¶ 50 On appeal, the defendant argued that the evidence presented at trial did not establish beyond a reasonable doubt that he had lured B.W. onto the bus. The court examined the totality of the circumstances to determine whether the defendant had enticed B.W. to remain with the defendant at all times, including when they boarded the bus. Based on the facts, the court concluded that a rational trier of fact could have found beyond a reasonable doubt that the defendant lured B.W. onto the bus. *Id.* at 1102.

¶ 51 Defendant attempts to distinguish *George* on two bases. Defendant points out that in *George* the defendant kept the victim within his control before his arrest, while in this case C.G. lived at home, actively participated in the plan to run away, and ultimately voluntarily entered defendant's car. We find these distinctions meaningless.

¶ 52 Here, defendant exploited C.G.'s immaturity and trustfulness and engaged in numerous acts that encouraged C.G.'s participation in a plan for her to accompany defendant to the airport and fly to California. While it is true that C.G. lived at home, she continued to associate with defendant against her parents' wishes and without their knowledge. During this time,

---

[1]Effective January 1, 2012, section 10-5 was amended to include the definition for luring used in the offense of "luring a minor" (720 ILCS 5/10-5.1(c)(4) (West 2008)). "Luring" is now defined as an act "to solicit, entice, tempt, or attempt to attract the minor." 720 ILCS 5/10-5(a)(2.2) (West 2012).

defendant plied C.G. with alcohol and manipulated her into sexual activity. Ultimately, defendant devised the plan to help C.G. run away across the country and to set her up in an apartment so that defendant essentially could continue his sexual relationship with her. Furthermore, while C.G. might have agreed with defendant's plan, it was clearly dictated by defendant. Defendant forged the birthday party invitation so that C.G. had an excuse to rendezvous with defendant at the mall. Defendant bought C.G.'s plane ticket. He provided false identification for C.G. He provided the transportation for C.G. from the mall to O'Hare Airport. He also provided transportation from the airport in California to the apartment, which he had rented for C.G.

¶ 53    As in *George,* defendant's statements and actions showed that defendant manipulated, coerced, and ultimately enticed C.G. to engage in illicit and illegal conduct, including entering his car, in furtherance of defendant's plan for C.G.'s unauthorized move to California. Whether we use the dictionary definition of "lure" or the definition now set forth in the statute, the result is the same. Based on the totality of the circumstances, a rational trier of fact could have found beyond a reasonable doubt that defendant lured C.G. into his car for an unlawful purpose. Accordingly, we affirm his conviction of the offense of child abduction.

¶ 54                                B. Sentences

¶ 55    Defendant argues that the trial court abused its discretion by imposing an excessive aggregate prison term. The trial court imposed consecutive 15-year terms of imprisonment on each of the three criminal sexual assault offenses, a concurrent 3-year term of imprisonment on the child abduction offense, and a concurrent 1-year term of imprisonment on the offense of unlawfully transferring a travel ticket to a minor. Thus, the trial court imposed an aggregate prison term of 45 years.

¶ 56    Defendant's sentence for child abduction is void, as under the law it must be served consecutively to the three criminal sexual assault sentences. See 730 ILCS 5/5-8-4(a)(ii) (West 2008); *People v. Curry*, 178 Ill. 2d 509, 539 (1997); *People v. Arna*, 168 Ill. 2d 107, 113 (1995). Thus, the trial court erred in imposing the sentence for child abduction.

¶ 57    The trial court also erred in imposing a fixed, three-year period of MSR on each of the criminal sexual assault convictions. Under section 5-8-1(d)(4) of the Unified Code of Corrections (730 ILCS 5/5-8-1(d)(4) (West 2008)), the trial court should have ordered an indeterminate MSR term of three years to natural life on each of the criminal sexual assault convictions. See *People v. Rinehart*, 2012 IL 111719, ¶¶ 23-30.

¶ 58    Despite the error in sentencing on the child abduction conviction, defendant does not request a remand for a new sentencing hearing. He points out that, if the case were remanded for a new hearing, the trial court might decide to simply modify the mittimus by requiring the 3-year term for the child abduction conviction to run consecutively to the aggregate 45-year term for the criminal sexual assault convictions. Given the trial court's determination that defendant deserves a 45-year aggregate term, defendant believes that the trial court would do nothing more than adjust the aggregate term on the criminal sexual assault convictions to 42 years and then impose the same 3-year term on the child abduction conviction, so that the total

aggregate term would still equal 45 years. Defendant contends that a 45-year aggregate term is excessive and that a 48-year aggregate term would be even more excessive.

The rule is that, where sentences are mandatorily consecutive and the defendant receives concurrent sentences, the sentences are void and the remedy is to remand for imposition of consecutive sentences. *People v. Harris*, 203 Ill. 2d 111, 121 (2003). Defendant's argument that the trial court would do nothing more than adjust the aggregate term on the criminal sexual assault convictions and impose the same three-year term on the child abduction conviction is speculative at best. Thus, on remand the trial court must determine the appropriate terms of the mandatorily consecutive sentences. See *Arna*, 168 Ill. 2d at 111-12. On remand, the trial court also will have the opportunity to correct the MSR error. Until the sentences are imposed, we cannot reach any issue regarding excessiveness. Accordingly, defendant's sentences for criminal sexual assault and child abduction are vacated and the cause remanded for resentencing.

¶ 59                                                CONCLUSION

¶ 60        For the preceding reasons, the judgment of the circuit court of Winnebago County is affirmed in part and vacated in part, and the cause is remanded for resentencing.

¶ 61        Affirmed in part and vacated in part; cause remanded.